## MERCHANTS NATIONAL BANK OF NEW YORK AND BANQUE COMMERCIALE DE BALE *v.* SEXTON, TRUSTEE IN BANKRUPTCY OF KESSLER & COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 287.   Argued May 2, 1913.—Decided May 26, 1913.

This court does not assent to the principle that one who takes an assignment of part of a claim secured by a common fund can, in the absence of a special agreement or necessary implication arising from particular circumstances, acquire more than a proportional right to the common security or the power to exclude his assignor in the event of a deficiency from participating therein to the extent of the portion retained.

The effect of bankruptcy is to so fix the relative rights of the different classes of creditors that it is not in the power of any class to set aside or frustrate as against the other, rights fixed by the adjudication in the assets of the estate, and it is the duty of the trustee to conserve and administer such rights.

A trustee, acquiring by purchase with assets of the general estate some of a series of notes on all of which the bankrupt is liable as endorser but which are all secured *pro rata* by a special fund with other notes of the same series and held by third parties, is subrogated by operation of law, as well as by subd. *c* and *f* of § 67 of the Bankruptcy Act, to all the rights of the parties from whom he purchased the notes and is entitled to share *pro rata* in such special fund as a holder of such notes.

The effect of a bank setting off against the bankrupt's credit balance a debt for which it holds collateral is to subrogate the trustee to all the rights of the bank in such collateral.

THE facts, which involve the power of the Trustee in Bankruptcy to use the funds of the estate on behalf of the general creditors to properly administer it and to conserve their rights, and the proportions in which the Trustee and creditors specially secured by a special fund shall share in such fund, are stated in the opinion.

*Mr. George Zabriskie* and *Mr. Henry G. Gray* for appellants submitted.

*Mr. Wallace MacFarlane*, with whom *Mr. Samuel J. Rosensohn* was on the brief, for appellee.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

In July, 1904, Kessler & Company, bankers, contracted to give the R. B. McLea Company, engaged in business as importers and jobbers of dry goods, a line of credit up to $50,000 and in addition to advance money on the invoice price of goods imported and for the purpose of paying the duties thereon. The advances, it was agreed, should be evidenced by negotiable notes of the company in such amounts and to be furnished at such times as desired by Kessler & Company. It was also agreed that the company would hold its stock in trade as a security for all the advances to be made with interest charges and commissions, and that the company, when required to do so, would execute any assignments or deeds reasonably necessary to the accomplishment of the purpose in view. It was moreover agreed that all sales of merchandise made by the company should be subject to approval by Kessler & Company, and when approved, Kessler & Company would guarantee the amount and that the account sales should be transferred to them as security, the accounts, when collected, to be applied to the extinction of the debt. On October 30, 1907, Kessler & Company made a general assignment and were adjudicated bankrupts on November 6 following, when Lawrence E. Sexton was designated as receiver and was appointed trustee on December 30. In the nearly three and one-half years which elapsed between the agreement of July, 1904, and the adjudication in bankruptcy, in 1907, Kessler & Company advanced a

large amount of money to the company, and at the date
of the bankruptcy there were outstanding notes to the
amount of $96,000 given by the company under the agree-
ment. Only one note for $7,000 was then held by Kessler
& Company, the other notes having been used by the firm
in the course of its business as collateral security for
money by it borrowed, as follows: With the Merchants
Bank of New York City, notes for $30,000; with the Bank
Commerciale de Bale, notes for $15,000; with the National
City Bank of New York City, notes for $39,000, and a
note for $5,000 with Kessler & Company, Limited,
Manchester, England.

It is not disputed that at the time Kessler & Company
delivered the notes as collateral or when the arrange-
ments were made for obtaining the credit to secure which
the collaterals were given, the nature and character of
the contract with the company was as stated and it is
not controverted that as the result of these statements
and the delivery of the collateral notes, holders of the
notes became entitled to participate in the security. After
the appointment of the receiver pending a rule taken by
him against the company for the purpose of asserting
his rights to the accounts and stock of merchandise secur-
ing the notes, an agreement was made between the re-
ceiver and the company which was sanctioned by the court
and put in the form of an order in substance providing
as follows: First, directing the receiver to collect any
unpaid account sales of the company assigned under the
contract of 1904 to Kessler & Company and forbidding
the company from interfering with the discharge by the
receiver of this duty; second, directing the company
to pay over to the receiver the proceeds of any assigned
account sale which had been collected by the company
after the service upon them of the rule to show cause on
November 16, 1907; and third, providing that an inventory
be taken by the receiver and the company, of all merchan-

dise purchased "during the life of the contract" between the company and Kessler & Company, the possession of which was in controversy between the parties, without prejudice to the right of the trustee when appointed to enforce any claims as such trustee arising from sales or deliveries of merchandise by the McLea Company prior to November 16, 1907. The McLea Company was authorized to deliver any of the inventoried merchandise in fulfillment of orders theretofore received and to make further sales and deliver goods so sold, all however with the approval of the receiver. Provision was made for the deposit by the receiver of the proceeds of the accounts and by the McLea Company of the proceeds of the merchandise, to await further action, it being specially declared that the making of the order was without prejudice to any of the rights of the McLea Company as against Kessler & Company, the receiver or trustee in bankruptcy when appointed, and that the consent of the McLea Company to the order should not be construed as an admission against its interests or waiver of its rights. The trustee realized from the accounts a sum slightly in excess of $32,000, and the McLea Company, acting under the agreement approved by the court realized from the stock of goods a sum slightly in excess of $12,000, making about $44,000 held as security under the contract of 1904 for the payment of the McLea notes. The Merchants Bank and the Commercial Bank of Bale by proceedings not necessary to state, acquired for a small price, which was credited on the debt due them by Kessler & Company, the collateral notes of the McLea Company. On some or all of these notes, judgments were obtained and execution issued or threatened to be issued against the stock of the McLea Company. That company and the two banks thereupon entered into an agreement by which the stock of merchandise was assigned to a named trustee with the duty, as the stock was realized on, to turn over the

proceeds for the purpose of paying the two banks. As this agreement was made after the rule to show cause, issued on behalf of the receiver and the order of the court consequent thereon, it was expressly provided in the agreement that it was not intended to violate the order of the court, but that it was subject to the approval of the court.

At the time of the adjudication in bankruptcy, Kessler & Company had a deposit account in the National City Bank to which there was a credit balance of $27,000. Although it is not controverted that the bank held as collateral the McLea notes to the amount of $39,000, there is a contention as to the adequacy of the proof, showing the amounts due that bank, back of which the notes were held as collateral. We content ourselves, however, on this subject with saying that we think it is not subject to be controverted on the record that the National City Bank had a claim for $39,000 and that it set off the deposit of $27,000 against this claim of $39,000 and that the trustee, in order to protect the bankrupt estate, paid the additional $12,000 and received from the National City Bank the $39,000, of McLea collateral notes, along with some other collaterals, the nature and amount of which is not disclosed.

The Merchants Bank and the Commercial Bank of Bale, having made a claim to a special right to the proceeds of the stock of merchandise, concerning which they had made the agreement above stated with the McLea Company, their claim was referred for consideration, to a special master. The receiver, the two banks, and Kessler & Company, Limited, of Manchester, being before the master, an agreement was entered into by which it came to pass that the master was called upon to consider and determine upon the facts, as we have stated them, the special rights of the parties in and to the fund derived from the stock of merchandise of the McLea Company

and the amount which had been collected from the account sales of merchandise.

Prior to the arising of the controversy now before us, it seems that a somewhat similar contest had arisen in the Kessler & Company bankruptcy, and had been decided by the District Court. The facts in such prior case were these: Kessler & Company had made an agreement with the firm of Milne, Turnbull & Company, to give financial assistance and take charge of the collection of account sales, etc., upon terms and conditions substantially like those embraced in the contract with the McLea Company which is now under consideration. Under that contract, Kessler & Company had received notes, had transferred some of the notes as collateral to the Merchants National Bank, and to Kessler & Company, Limited, of Manchester and had retained the remainder. Under these circumstances the question which arose was, how should a sum of money derived from the account sales or stock of Milne, Turnbull & Company, which was a security for the outstanding notes, be distributed among the holders of the notes; that is, it being insufficient to pay all the notes, should it be ratably applied, or was Kessler & Company as assignor to be excluded from the distribution until the assignees had been paid? Considering that the question was open and not settled, under the local law of New York, the court came to determine it by its appreciation of principles of general law and held that as Kessler & Company, as transferror, occupied a trust relation, that firm could not be allowed to violate its trust by diminishing the security which otherwise would be attributable to the transferred notes. Considering the relation of the transferees between themselves, it was decided that although the act of Kessler & Company, after having transferred some of the notes, in transferring others, was a breach of trust, the second transferee was unaffected thereby and therefore the fund was subject to be distributed between

the two transferees *pro rata* to the exclusion of Kessler & Company, or its trustee. The court said:

"It seems to me that that is exactly the situation here: Kessler was solely entitled to receive the proceeds of the accounts payable pledged by Milne, and he so remained down to the time of these bankruptcies. These accounts were, to be sure, security for all the notes that Kessler had, but when he assigned some of the notes he became a trustee for his assignee to the extent of the face value of the notes in question.

"It can hardly need authority to show that in a court of equity the *cestui que trust* is actually seized of the trust property; he may alien it, and any legal conveyance by him will have the same operation in equity upon the trust as it would have had at law upon a legal estate. *Croxall* v. *Shererd*, 5 Wall. 281, 18 L. Ed. 572.

"It can make no difference that a holder of collateral securing several notes assigns them successively and thereby diminishes the value of each note in the event of deficiency. Each *cestui que trust* takes his chances of that, but if (in this case) Kessler became a trustee for the bank by the act of assignment, no act of his, nor any change in his circumstances can change his relation to the *cestui que trust* he himself created. To the extent of his ability he is at all times bound to account for the trust he had himself created, and that duty has by operation of law descended to his trustee in bankruptcy."

In the light of this ruling in the previous case, the special master, in deciding this controversy concluded that the receiver of Kessler & Company as assignor was not entitled, as to the $7,000 or the $39,000 of McLea notes which he held, to participate in the distribution and therefore the fund should be ratably distributed between the Merchants Bank, the Bank of Bale and Kessler & Company of Manchester. Under this view the master concluded that it was unnecessary to consider the claim made

by the two banks that because of the agreement with the McLea Company subsequent to the bankruptcy they were exclusively entitled to the proceeds of the stock of merchandise.

When the District Court came to consider a motion to confirm the report, its previous decision in the Milne, Turnbull & Company case was pending undetermined on appeal in the Circuit Court of Appeals. While adhering to the ruling made in that case, it was nevertheless decided that the master had erred in considering that case as decisive of the right of the trustee as the holder of the $39,000 of collateral notes, to participate in the security to the extent that the general funds of the bankrupt estate had discharged the principal debt of the National City Bank, on the ground that to the extent of such payment, the trustee, as the representative of the general creditors, was, by operation of law subrogated to the rights of the bank. In addition to this general right of subrogation, it was held that the right of the trustee to participate to the extent stated was secured by the provisions of subdivisions c and f of section 67 of the Bankruptcy Act. Disposing of the right asserted against the proceeds of the stock of merchandise, it was decided that whatever might have been the infirmity, for want of delivery, if any, of the agreement constituting the stock as a security it was too late to raise such question on behalf of the Merchants Bank and the Bank of Bale, after the trustee had virtually, as a result of the agreement, sanctioned by an order of the court, taken possession of the stock for the purpose of carrying out the agreement. Thereafter, the ruling made in the Milne, Turnbull & Company case was affirmed by the Circuit Court of Appeals upon substantially the reasoning which controlled the court below (*In re Milne,* 185 Fed. Rep. 244) and that court, in affirming the action of the trial court taken in this case, also approved and adopted the

reasoning which caused the trial court, to permit the trustee to participate, to the extent stated, in the fund held by him as security for the payment of the collateral notes. The court however, while referring to the right asserted by the Merchants Bank and the Bank of Bale, to exclusively participate on special grounds in the proceeds of the stock, made no ruling on the subject; and error with reference to that matter, as well as with regard to the ruling, permitting the trustee to participate to the extent allowed in the funds securing the collateral notes, are the subjects which we are called upon to consider on this appeal taken by the Merchants Bank and the Bank of Bale.

Although it be conceded for the sake of argument that the power conferred upon Kessler & Company to control the sales of merchandise, did not operate to take this case out of the rule as to delivery, which was upheld in the cases relied upon, we nevertheless put out of view the contention of the two banks, concerning their particular right to the merchandise fund, for the following reasons: *a*, because we think the trial court was clearly right in holding that after the trustee had virtually exerted, under the sanction of the court, with the assent of the McLea Company, the power to take legal possession of the stock, it was too late for the two banks as a result of an agreement with the McLea Company, thereafter made, to raise the question of whether the original agreement as to the stock between Kessler and the McLea Company was ineffective to operate a lien as to creditors because of the want of delivery; *b*, as the two banks were seeking to enforce the contract and the lien arising therefrom, so far as the avails of the account sales were concerned, we do not think they could be heard to disintegrate the contract by enforcing rights given under one provision and repudiating another provision, the two being under the contract indissolubly associated, the one being the complement of the other.

Underlying the question of the right of the trustee to participate to the extent of the general estate absorbed in acquiring the $39,000 of collateral notes in the fund securing all such notes is the ruling made by the court below in *In re · Milne, supra.* As, however, no appeal was taken in the *Milne Case* and the trustee has not here appealed and it is possible to dispose of the case upon the grounds upon which it was rested below, without reëxamining the broader and more fundamental ruling involved in *In re Milne,* we shall confine our attention to the narrower question here arising. In doing so, however, in view of the importance of the subject and of its far-reaching effect, we do not desire, even by implication, to be understood as giving our assent to the principle that one who takes an assignment of part of a claim secured by a mortgage or other lien upon a common fund, thereby, in the absence of special agreement or necessary implication arising from particular circumstances, acquires anything more than a proportional right to the common security, or the power to exclude his assignor in the event of a deficiency, from participating in such fund to the extent of the portions of the claim held by him. Moreover, for the same reason which causes us to make the reservation just stated, we also desire to expressly exclude any inference that our opinion is that under the contract here involved, and the facts here disclosed, there was either an express agreement or anything justifying an implication which would take the case out of the rule of proportional distribution, if that rule were otherwise applicable.

By the effect of the bankruptcy, the rights of the parties became fixed. The collateral note holders had a fund specially applicable to the payment of their debt, and the general creditors had the general fund to which alone they could look for the discharge of what was due them. It was in the power of neither class to set aside or frustrate as against the other the rights fixed by the adjudication

and which it was the duty of the trustee to conserve and administer. The fund on deposit to the credit of the general estate was an asset of that estate. True, it was subject to be set off, that is, compensated, by the debt due to the National City Bank. But the exercise by that bank of the right of set-off did not change the character of the two funds and could not confer upon the National City Bank the power to pay its debt out of the general fund and thereby diminish the general estate and increase the share of the security fund distributable among those entitled to participate in that fund. The impossibility, legally, of bringing this result about, at once demonstrates the application to the situation of the elementary principle of legal subrogation which for the protection of the general fund gives to that fund and to its representative, the trustee, the right to exercise against the special fund, recourse to the extent necessary to prevent the inequality and destruction of right which otherwise would result. To suppose that that principle here finds no application, because Kessler & Company itself, the bankrupt, if it had held the collateral notes could not enforce them under the principle decided in *In re Milne ub. sup.*, as lucidly pointed out by the court below, is but to disregard the situation resulting from the adjudication in bankruptcy and to destroy the equality of distribution, which it was the purpose of that act to secure. Nothing could more clearly demonstrate this conclusion, than a consideration of the result to be brought about by taking the opposite view, since if that is done, the situation existing at the time of the adjudication would be seriously changed, the rights of the general creditors would be lost, and those of the secured creditors would be greatly enlarged. But resort to the principle of legal subrogation is not here necessary, as the subject is fully covered by subdivisions c and f of § 67 of the bankruptcy act, especially as elucidated by *First National Bank* v. *Staake*, 202 U. S. 141. Moreover,

even though it be admitted that there would be a possibility if the text were narrowly considered, to take this case out of the operation of the section, its obvious spirit and intent, as illustrated and made cogent by the entire text of the act, by the purpose which it was intended to subserve, the distinction between secured and unsecured creditors which it draws, all conclusively demonstrate the correctness of the principle which the court below applied, and by which it held this case was not controlled by the doctrine by it announced in *In re Milne.*

*Affirmed.*